**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LUZVIMINDA RASOS COLOBONG, AKA Lydia Palaganas Visperas, <br><br> Petitioner, <br><br> v. <br><br> ERIC H. HOLDER, Jr., Attorney General, <br><br> Respondent. | No. 08-73232 <br><br> Agency No. A096-215-991 <br><br> MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 18, 2010
Honolulu, Hawaii

Before: B. FLETCHER, PREGERSON, and CLIFTON, Circuit Judges.

Luzviminda Rasos Colobong ("Colobong"), a native and citizen of the

Philippines, petitions for review of the Board of Immigration Appeals' ("BIA")

order dismissing her appeal from an immigration judge's ("IJ") decision denying

her application for asylum, withholding of removal, and relief under the

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

Convention Against Torture ("CAT").[1]  We have jurisdiction under 8 U.S.C.

§ 1252.  Because the BIA expressly adopted the IJ's decision*, citing Matter of*

*Burbano*, 20 I. & N. Dec. 872 (BIA 1994), but also provided its own review of the

evidence and the law, we review both the IJ and the BIA's decision.  *See Hosseini*

*v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006).

We review a determination that an applicant has not established eligibility

for asylum under the substantial evidence standard of review.  *See Singh v. INS*,

134 F.3d 962, 966 (9th Cir. 1998).  We grant the petition and remand to the BIA.

## I.  Colobong's Entry into the United States

After her husband was killed, Colobong arranged for her children to be sent

to the United States.  She later learned that another man had accompanied her

children into the United States and assumed her deceased husband's identity.

Fearing for her life, Colobong then arranged for her own entry into the United

States, signed papers using a fake name, Lydia Visperas, and appeared for an

interview with the U.S. embassy using that name.  In 2006, Colobong was

convicted of misuse of a social security number acquired through fraud and of

---

[1]  An oral screening panel denied Colobong's petition for review to the extent that it challenged the BIA's discretionary denial of her request for a waiver under INA § 237(a)(1)(H).  We lack jurisdiction to review the denial of the waiver. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); 8 U.S.C. § 1227(a)(1)(H).

employment verification fraud; both convictions related to her assuming the false identity of Lydia Visperas.

## II. Asylum

Here, the IJ failed to make an express adverse credibility finding. Because the IJ did not make an explicit adverse credibility finding, we deem Colobong credible. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004).[2]

Substantial evidence does not support the IJ's conclusion that Colobong failed to establish that she suffered past persecution on account of a protected ground. Colobong's husband, a political leader in their village, was found dead in the street with 64 bullets in his body. After this, Colobong and her children received death threats. Shortly thereafter, the political leader of a neighboring village, or "bangaray," was killed. The IJ lacked substantial evidence to find that Colobong did not suffer past persecution. *See Shah v. INS,* 220 F.3d 1062, 1072 (9th Cir. 2000) (finding past persecution where petitioner's husband was killed and she and her children were threatened); *Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004) (finding threats, combined with anguish suffered as a result of the killing of a fellow Burmese preacher, to constitute persecution).

---

[2] We apply pre-REAL ID Act standards because Colobong filed her application for relief on December 4, 2004, which was prior to May 11, 2005, the effective date of the REAL ID Act. *See Sinha v. Holder*, 564 F.3d 1015, 1021 n.3 (9th Cir. 2009) (applying pre-REAL ID Act standards because petitioner's asylum application was filed before May 11, 2005).

Asylum applicants must provide some evidence, direct or circumstantial, that the persecutor was or would be motivated to pursue the applicants because of their actual or imputed status or belief. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992).

> In some cases, the factual circumstances alone may provide sufficient reason to conclude that acts of persecution were committed on account of political opinion . . . . Indeed, this court has held persecution to be on account of political opinion where there appears to be no other logical reason for the persecution at issue.

*Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) (internal citation omitted); *see also Silaya v. Mukasey*, 524 F.3d 1066, 1070-71 (9th Cir. 2008) ("[E]vidence that the alleged persecutor acted because of a petitioner's family's political associations is sufficient to satisfy the motive requirement." (internal quotation marks and alteration omitted)).

Substantial evidence does not support the IJ's conclusion that Colobong failed to establish that she suffered past persecution on account of her political opinion or imputed political opinion. When her husband's great-uncle summoned him from the house on the night of the murder, armed men in uniform accompanied the great-uncle. Her husband was shot an extraordinary 64 times. Three months after her husband's death, the mayor, or "bangaray captain," of the nearest bangaray was also murdered. Because the record compels the conclusion

4

that the same person or persons who killed Colobong's husband also threatened her and her children, the record also compels the conclusion that Colobong suffered past persecution on account of her imputed political opinion — especially in light of other record evidence, including the 2003 State Department Human Rights Country Report for the Philippines.

The record also compels the conclusion that the persecution Colobong suffered was motivated by her membership in her politically active immediate family. *See Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986) ("[A] prototypical example of a 'particular social group' would consist of the immediate members of a certain family."). The way in which Colobong's husband was murdered shows that the killing was not random, and shortly after the murder Colobong's family received a letter the neighbors said contained a death threat against her son Juno. The record makes it plain that this letter was not the only death threat the family received in the days following the murder. And as we have noted, any reasonable factfinder would conclude that the person or persons who killed Colobong's husband also threatened the family after the murder.

"If past persecution is established, a rebuttable presumption of a well-founded fear arises, 8 C.F.R. § 208.13(b)(1), and the burden shifts to the government to demonstrate that there has been a fundamental change in

5

circumstances such that the applicant no longer has a well-founded fear." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (internal quotation marks omitted). The government may rebut the presumption of a well-founded fear of persecution by showing "by a preponderance of the evidence" that there has been a "fundamental change in circumstances such that the applicant no longer has a well-founded fear." 8 C.F.R. § 1208.13(b)(1)(i) & (ii).

The IJ found that Colobong's two return trips to the Philippines undermined her well-founded fear of persecution. Return trips can be considered as one factor, among others, that rebut the presumption of a threat of persecution. *See Loho v. Mukasey*, 531 F.3d 1016, 1017-18 (9th Cir. 2008). The Ninth Circuit has concluded, however, that return trips to a country of origin do not necessarily rebut the presumption of a well-founded fear of future persecution. *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1091 (9th Cir. 2005); *Karouni v. Gonzales*, 399 F.3d 1163, 1175-76 (9th Cir. 2005).

In this case, Colobong always intended to permanently flee the Philippines. Colobong only returned when compelled to do so by the grave illnesses of her father in 1999, and her mother in 2004. During those visits, Colobong avoided drawing attention to herself, spent only one or two days at a time in her home village, and did not tell even her family where she was staying. Thus, Colobong's

6

return trips to the country where she feared persecution to visit her sick parents does not undermine her well-founded fear of future persecution. Further, the continued presence of Colobong's family members in the Philippines does not rebut Colobong's well-founded fear, because there is no evidence that her extended family was similarly situated or subject to similar risk. *See Zhao v. Mukasey*, 540 F.3d 1027, 1031 (9th Cir. 2008).

### III. Withholding of Removal and Relief Under CAT

Because Colobong established that she suffered past persecution, she is eligible for asylum, we therefore remand so that the BIA "may apply the law to the facts" of her withholding claim. *See Mashiri v. Ashcroft*, 383 F.3d 1112, 1123 (9th Cir. 2004). We lack jurisdiction over Colobong's CAT claim because she failed to raise it before the BIA. *See Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009).

### CONCLUSION

We grant the petition for review and conclude that Colobong is statutorily eligible for asylum. We remand to the Attorney General to exercise discretion to grant Colobong's asylum claim and to consider whether Colobong is eligible for withholding of removal. We deny Colobong's petition with respect to her CAT claim.

It is worth noting that the IJ in this case wrote that, if she erred in finding Colobong ineligible for asylum, she would exercise her discretion to grant Colobong asylum because of her ties to her son, Juno, and her son-in law, Ole, both of whom are on active-duty with the U.S. Navy. AR 638.[3] We have previously noted that the way in which an asylum applicant enters the country, even where the entry involves fraud, "is worth little if any weight" in the decision whether to exercise discretion to grant asylum. *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004). "When a petitioner who fears deportation to [her] country of origin uses false documentation or makes false statements in order to gain entry to a safe haven, that deception does not detract from but supports [her] claim of fear of persecution." *Id.* (quotation marks and citation omitted).

**PETITION GRANTED AND REMANDED IN PART, DENIED IN PART.**

---

[3] The IJ's specific words were:
If the Court has erred in finding respondent is not eligible for asylum based on [] a well-founded fear of persecution if she returns to the Philippines, there is also the matter of discretion. In this case, it is quite difficult to favorably exercise discretion where there are multiple frauds. . . . On the other hand, respondent is the mother of a[n] active-duty Naval officer, Juno Colobong, and the mother-in-law of Ole Betran, who is also active-duty in the U.S. Navy. Because of her ties to these two men, the Court would have granted the asylum application as a matter of discretion despite the fraud. This is also because respondent's son has indicated that he is in desperate need of childcare for his baby since his wife is also active-duty Navy and is assigned to a ship.

No. 08-73232, *Colobong v. Holder*

CLIFTON, Circuit Judge, dissenting:

I respectfully dissent. "To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). The majority reverses the finding of the BIA and the IJ that Colobong failed to establish that she suffered past persecution on account of a protected ground, but the evidence does not compel the majority's conclusion.

The brutal murder of Colobong's husband, Simeon Colobong, was tragic. It is not so clear, though, that it was motivated by an actual or imputed political opinion. No witnesses identified the assailants and the murder was never solved. Petitioner suggested that responsibility might lie with the New People's Army or perhaps with an unnamed high-ranking government official, but she cited only rumors and anonymous notes to support her suspicions, nothing compelling or even very persuasive. Notably, she identified no political opinion held by her husband that might be expected to put him at risk and gave no reason why her husband would be targeted by any particular assailant beyond the fact that Simeon was an elected official in their village.

It is even less clear that a political motivation aimed at harming the husband, especially if based upon his position as an elected village official, might extend to put Petitioner at risk. She was not an elected village official. The majority notes

that the political leader of a neighboring village was killed, but there's no evidence that other members of that leader's family were harmed. Petitioner described herself as a social activist, but being president of the local parent teacher association is hardly compelling proof that she was herself at risk on account of an imputed political opinion. Other members of the family continued to live in the Philippines for many years without incident. The evidence does not compel a conclusion that Petitioner could not have done the same.

The involvement of Simeon's uncle Efren Colobong is especially hard to reconcile with the political motivation alleged by Petitioner. It was Efren who came to the family's door one night and called for Simeon to go out. A short time later, Simeon was shot 64 times. Petitioner's brother Guillermo told the family about the dead body in the street near the family's home. Efren apparently did not appear. Petitioner testified that she later begged Efren to tell her what happened but Efren refused to open his mouth. Years later an immigration agent contacted Efren, by then himself living in Honolulu, and Efren said he barely knew Petitioner and her daughter, though Efren's wife contradicted that denial. Out of these unusual facts it is not hard to infer that Simeon might have been killed on account of something other than his political opinion. The evidence simply does not compel a finding that the motivation for Simeon's murder must have been his political

opinion and that Petitioner was at risk due to some imputed political opinion.

The majority concludes by noting that the IJ specifically wrote in 2004 that she would exercise her discretion to grant Petitioner asylum, and that we have suggested that the way an asylum applicant enters the country, even when the entry involved fraud, should not weigh against a favorable exercise of discretion. But that ignores the rest of the story. Petitioner's fraud did not stop once she entered the United States. She continued to use a false name and social security number and ran up unpaid debt using that false name, such that by 2007 the same IJ decided that Petitioner did not deserve a favorable exercise of discretion, in the context of a request for a waiver of inadmissibility:

> This will be a rare case in which this Court denies a discretionary waiver to an applicant whose close relatives are active duty military, but the Court simply cannot conclude that the favorable factors outweigh the adverse factors. In summary, the misrepresentation waiver will be denied because of the extent of immigration fraud, the pattern and extent of unpaid debt in the Visperas name, the continuing employment during removal proceedings in the name of Lydia Visperas, and because the respondent has returned twice to the Philippines of her own accord which suggests that the level of danger she faces there is not substantial at this time.

Like many applicants, Petitioner presented a story with some highly sympathetic aspects, but it was not a one-sided story. More to the point, it was not a story that compelled a conclusion in Petitioner's favor. I would deny the petition.

3